Michael R. Lozeau (State Bar No. 142893)
Douglas J. Chermak (State Bar No. 233382)
E-mail: michael@lozeaudrury.com
      doug@lozeaudrury.com
LOZEAU DRURY LLP
1939 Harrison Street, Suite 150
Oakland, CA 94612
Tel: (510) 836-4200
Fax: (510) 836-4205

Attorneys for Plaintiff
CENTER FOR COMMUNITY ACTION
AND ENVIRONMENTAL JUSTICE

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR COMMUNITY ACTION AND ENVIRONMENTAL JUSTICE, a non-profit corporation,<br><br>    Plaintiff,<br><br>    vs.<br><br>THE PEGGS COMPANY, INC., a corporation,<br><br>    Defendant. | Case No. _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CENTER FOR COMMUNITY ACTION AND ENVIRONMENTAL JUSTICE ("CCAEJ"), a California non-profit corporation, by and through its counsel, hereby alleges:

COMPLAINT

1

## I.   __JURISDICTION AND VENUE__

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.      On June 16, 2021, Plaintiff provided notice of Defendant's violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Santa Ana Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of CCAEJ's notice letter is attached as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on Defendant and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.

COMPLAINT

This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.    Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.   <u>INTRODUCTION</u>

5.    This complaint seeks relief from Defendant's discharges of polluted storm water from Defendant's industrial facility located at 4851 Felspar Street in Riverside, California ("Facility").  These discharges are in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ, as renewed by Water Quality Order No. 2014-0057-DWQ ("General Permit"). Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

6.    With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways.  The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year.

7.    Industrial facilities, like Defendant's, that are discharging polluted storm water and non-storm water contribute to the impairment of downstream waters and

COMPLAINT

3

aquatic-dependent wildlife.  These contaminated discharges can and must be controlled for the ecosystem to regain its health.

### III.   PARTIES

8.      Plaintiff CCAEJ is a non-profit public benefit corporation under the laws of the State of California with its main office in Jurupa Valley, California.  CCAEJ is dedicated to working with communities to advocate for environmental justice and pollution prevention.  CCAEJ and its members are deeply concerned with protecting the environment in and around their communities, including the Santa Ana River Watershed.  To further these goals, CCAEJ actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

9.      CCAEJ has members living in the communities near the Facility and the Santa Ana River Watershed.  They enjoy using the Santa Ana River for recreation and other activities.  Members of CCAEJ use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged. Members of CCAEJ use those areas to recreate and view wildlife, among other things. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CCAEJ's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

10.      CCAEJ brings this action on behalf of its members.  CCAEJ's interest in

COMPLAINT

reducing Defendant's discharges of pollutants into the Santa Ana River and its tributaries and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of CCAEJ.

11.    Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

12.    Defendant THE PEGGS COMPANY, INC. ("Peggs") is a limited liability corporation that owns and/or operates the Facility that is at issue in this action.

## IV.    STATUTORY BACKGROUND

### Clean Water Act

13.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

14.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual

COMPLAINT

5

permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

15.     The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. S*ee* 40 C.F.R. § 122.2.  The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.  The Act requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

16.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

**General Permit**

17.     The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board originally issued the General Permit on or about November 19, 1991.  The State Board modified the General Permit on or about September 17, 1992.  Pertinent to this action, the State Board reissued the General Permit on or about April 17, 1997, and again on or about April 1, 2014, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).  The current version of the General Permit went into effect on July 1, 2015.

18.     In order to discharge storm water lawfully in California, industrial

COMPLAINT

6

facilities must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

19.     The General Permit contains several prohibitions.  Effluent Limitation V(A) prohibits discharges unless pollutants have been reduced or prevented through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition III(C) prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation VI(B) prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation VI(A) and Discharge Prohibition III(D) prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

20.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

21.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities

COMPLAINT

7

and measures that comply with the BAT and BCT standards.  For dischargers beginning industrial activities before October 1, 1992, the General Permit requires that an initial SWPPP has been developed and implemented before October 1, 1992. The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges.  General Permit, § X(C).  These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.  To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary.  *Id*., § X(B).  Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit.  *Id*., Fact Sheet § I(1).

22.     Section X of the General Permit sets forth the requirements for a SWPPP.  Among other requirements, the SWPPP must include: an Annual Evaluation, the date of preparation, the date of subsequent amendments, a pollution prevention team; a site map containing facility boundaries and depicting municipal storm drain inlets; an evaluation of non-storm water discharges; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be

COMPLAINT

implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective. Dischargers must develop and implement a set of minimum BMPs, as well as any advanced BMPs as necessary to achieve BAT/BCT, which serve as the basis for compliance with the General Permit's technology-based effluent limitations and receiving water limitations.

23.     The General Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping. *Id.*, § X(H)(1). Failure to implement these minimum BMPs is a violation of the General Permit. *Id.*, Fact Sheet § I(2)(o). The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs. *Id.*, § X(H)(2). Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit. *Id.* The General Permit also requires that the SWPPP include BMP descriptions and a BMP Summary Table. *Id.*, § X(H)(4), (5).

COMPLAINT

9

24.     The General Permit requires dischargers to develop and implement an adequate written Monitoring Implementation Program ("MIP").  The primary objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.  As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  The General Permit mandates that facility operators sample four storm water discharges from all storm water discharge locations at a facility over the course of the reporting year.  *Id*., §§ XI(B)(2), (3).

25.     Under the General Permit, facilities must collect and analyze storm water discharges for "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment."  *Id*., § XI(B)(6)(c).

26.     Under the General Permit, a facility must analyze collected samples for "[a]dditional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section X.G.2.a.ix."  *Id*., § XI(B)(6)(d).

27.     Section XI(B)(2) of the General Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during

COMPLAINT

the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30).

28.     Section XVI(A) of the General Permit requires dischargers to certify and submit completed Annual Reports by July 15th of each year.

29.     Section XII of the General Permit sets out the requirements for Exceedance Response Actions ("ERAs").  When a discharger's sampling results indicate a Numeric Action Level ("NAL") exceedance for a particular parameter during a reporting year [for which it is presently at Baseline status), a discharger must complete a Level 1 ERA Evaluation by the following October 1st, and must submit a Level 1 ERA Report by the following January 1st.  *Id.*, § XII(C).

30.     Section XII(D)(2)(a) of the General Permit sets out the requirements for a Level 2 ERA Technical Report with an Industrial Activity BMPs Demonstration, which, inter alia, requires a discharger to provide, when additional BMPs are not expected to eliminate future NAL exceedances, an evaluation of additional BMPs that would reduce or prevent NAL exceedances, estimated costs of the BMPs evaluated, and an analysis describing the bases for the selection of BMPs implemented in lieu of the additional BMPS evaluated but not implemented.

31.     The General Permit does not provide for any mixing zones by dischargers.  The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

**Basin Plan**

32.     The Regional Board has identified beneficial uses and established water

quality standards for the Santa Ana River and its tributaries in the "Water Quality Control Plan for the Santa Ana River Basin (Region 8)," generally referred to as the Basin Plan.

33.     The beneficial uses of these waters include, among others, groundwater recharge, water contact recreation, non-contact water recreation, wildlife habitat, warm freshwater habitat, and rare, threatened or endangered species.  Non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible.  These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting, sightseeing and aesthetic enjoyment in conjunction with the above activities."  Basin Plan at 3-3.  Contact recreation use includes fishing and wading.  *Id*.

34.     Discharges of pollutants at levels above water quality standards contribute to the impairment of beneficial uses of the waters receiving the discharge, in violation of the General Permit.

35.     The Basin Plan includes a narrative toxicity standard which states that "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health."

36.     The Basin Plan includes a narrative suspended and settleable solids standard which states that "Inland surface waters shall not contain suspended or settleable solids in amounts which cause a nuisance or adversely affect beneficial uses..."

COMPLAINT

12

37.     The Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5…"

38.     The Basin Plan contains a narrative floatables standard which states that '[w]aste discharges shall not contain floating materials, including solids, liquids, foam or scum, which cause a nuisance or adversely affect beneficial uses."

39.      The Basin Plan contains a narrative color standard which states that "[w]aste discharges shall not result in coloration of the receiving waters which causes a nuisance or adversely affect beneficial uses."

40.     The EPA 303(d) List of Water Quality Limited Segments lists Reach 3 of the Santa Ana River as impaired for copper, indicator bacteria, and lead.

41.     The EPA has adopted a freshwater numeric water quality standard for zinc of 0.120 mg/L (Criteria Maximum Concentration – "CMC").  65 Fed.Reg. 31712 (May 18, 2000) ("California Toxics Rule").

42.      EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.  The following EPA benchmarks have been established for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100 mg/L; oil and grease ("O&G") – 15 mg/L; zinc – 0.26 mg/L; nitrate plus nitrite nitrogen ("N+N") – 0.68 mg/L; iron – 1.0 mg/L; and aluminum – 0.75 mg/L.

COMPLAINT

13

43.     The General Permit establishes annual Numeric Action Levels ("NALs") and instantaneous maximum NALs.  The following annual NALs have been established under the General Permit: TSS – 100 mg/L; O&G – 15 mg/L; zinc – 0.26 mg/L; N+N – 0.68 mg/L; iron – 1.0 mg/L; and aluminum – 0.75 mg/L.  An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  The General Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400 mg/L; and O&G – 25 mg/L.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires an ERA report requiring a revision of the SWPPP and additional BMPs.  If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.

44.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or

COMPLAINT

partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $56,460 for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.    STATEMENT OF FACTS

45.    Defendant owns and/or operates the Facility, a shopping cart and cart corral manufacturing facility located in Riverside, CA.

46.    The Facility falls within Standard Industrial Classification ("SIC") Code 3499.

47.    The Facility covers an area of approximately 8.4 acres.

48.    Based on CCAEJ's investigation, including a review of the Facility's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPPs, aerial photography, and CCAEJ's information and belief, storm water is collected and discharged from the Facility via at least one storm water discharge location.  Storm water discharged from the Facility flows into channels that flow into Riverside County's municipal storm sewer system, which discharges into the San Sevaine Channel, which flows into Reach 3 of the Santa Ana River (collectively, "Facility Receiving Waters").

49.    Information available to Plaintiff indicates that the Facility Receiving Waters are waters of the United States.

COMPLAINT

15

50.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facility where industrial activities occur including activities associated with the primary activity of manufacturing and refurbishing shopping carts and cart corrals industrial gases.  Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects metals, pH-altering substances, nitrates, nitrites, and other pollutants as it flows towards the storm water discharge location.

51.     On information and belief, Plaintiff alleges that the majority of storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

52.     On information and belief, CCAEJ alleges that there are insufficient structural storm water control measures installed at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with exposed areas of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

53.     Since at least August 7, 2016, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility.  The sample results

COMPLAINT

16

were submitted to the State Board via the Stormwater Multiple Application and Report Tracking System ("SMARTS").

54.     In storm water sampling results submitted to the State Board, the Facility has consistently reported high pollutant levels from its storm water sampling results.

55.     The Facility has reported numerous discharges outside the range of the numeric water quality standard for pH of 6.5 – 8.5 established in the Basin Plan. Defendant analyzed storm water discharges with a pH level below 6.5 on the following dates: February 14, 2019; March 22, 2018; October 24, 2016; and October 18, 2016.

56.      The levels of zinc in storm water detected by the Facility have exceeded the freshwater numeric water quality standard established by the EPA of 0.120 mg/L for zinc (CMC).  For example, on December 28, 2020, the level of zinc measured at the Facility's storm water outfall was 4.54 mg/L.  That level of zinc is almost 38 times the CMC for zinc.  Defendant also has measured levels of zinc in storm water discharged from the Facility in excess of 0.120 mg/L in every storm water sampling event at the Facility for the past five years, including the following dates: March 10, 2020; December 4, 2019; November 27, 2019; February 14, 2019; January 31, 2019; December 6, 2018; November 29, 2018; March 22, 2018; January 8, 2018; September 1, 2017; March 22, 2017; October 24, 2016; and October 18, 2016.

57.     The levels of zinc in storm water detected by the Facility have exceeded the benchmark value and annual NAL for zinc of 0.26 mg/L established by EPA and the State Board, respectively.  For example, on December 28, 2020, the level of zinc

COMPLAINT

17

measured at the Facility's storm water outfall was 4.54 mg/L.  That level of zinc is over 17 times the benchmark value and annual NAL for zinc.  Defendant also has measured levels of zinc in storm water discharged from the Facility in excess of 0.26 mg/L in every storm water sampling event at the Facility for the past five years, including the dates mentioned in the preceding paragraph.

58.     The levels of N+N in storm water detected by the Facility have exceeded the benchmark value and annual NAL for N+N of 0.68 mg/L established by EPA and the State Board, respectively.  For example, on November 27, 2019, Defendant measured a level of N+N of 4.95 mg/L in storm water discharged from the Facility.  That level of N+N is over seven times the benchmark value and annual NAL for N+N.  Defendant also has measured levels of N+N in storm water discharged from the Facility in excess of 0.68 mg/L on the following dates: March 10, 2020; October 24, 2016; and October 18, 2016.

59.     The levels of iron in storm water detected by the Facility have exceeded the benchmark value and annual NAL for iron of 1.0 mg/L established by EPA and the State Board, respectively.  For example, on December 6, 2018, the level of iron measured at the Facility's storm water outfall was 3.09 mg/L.  That level of iron is over three times the benchmark value and annual NAL for iron.  Defendant also has measured levels of iron in storm water discharged from the Facility in excess of 1.0 mg/L on the following dates: November 27, 2019; October 24, 2016; and October 18, 2016.

60.     The levels of aluminum in storm water detected by the Facility have

COMPLAINT

18

exceeded the benchmark value and annual NAL for aluminum of 0.75 mg/L established by EPA and the State Board, respectively.  For example, on December 6, 2018, the level of aluminum measured at the Facility's storm water outfall was 1.84 mg/L.  That level of aluminum is almost 2.5 times the benchmark value and annual NAL for aluminum.  Defendant also has measured levels of aluminum in storm water discharged from the Facility in excess of 0.75 mg/L on the following dates: October 24, 2016; and October 18, 2016.

61.     On information and belief, Plaintiff alleges that since at least August 7, 2016, Defendant has failed to implement BAT and BCT at the Facility for its discharges of pH, zinc, N+N, iron, aluminum, and other potentially un-monitored pollutants.  Effluent Limitation V(A) of the General Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

62.     On information and belief, CCAEJ alleges that Peggs failed to collect and analyze the required storm water discharges as follows:

- Failure to collect and analyze a second sample during the second half of the 2016-2017 reporting year.

- Failure to collect and analyze a second sample during the second half of the 2019-2020 reporting year.

- Failure to collect and analyze a second sample during the first half of the 2020-2021 reporting year.

COMPLAINT

19

- Failure to collect and analyze two samples during the second half of the 2020-2021 reporting year.

63.    On information and belief, CCAEJ alleges that Defendant failed to collect and analyze storm water samples from its storm water discharge location from the following QSEs:

- One of the required QSEs during the first half of the 2016-2017 reporting year.

- One of the required QSEs during the second half of the 2016-2017 reporting year.

- One of the required QSEs during the second half of the 2019-2020 reporting year.

64.    Section XVI.A of the General Permit requires dischargers to certify and submit completed Annual Reports by July 15th of each year.  The Annual Report must consist of, *inter alia*, an explanation for any non-compliance of requirements within the reporting year.  General Permit, § XVI(B)(2).  CCAEJ alleges that both Defendant's 2019-2020 and 2020-2021 Annual Reports failed to comply with this requirement.

65.    On information and belief, Plaintiff alleges that since at least August 7, 2016, Defendant has failed to implement an adequate SWPPP for the Facility. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific best management practices for the facility that are consistent with BAT or BCT for the Facility.  Plaintiff is informed and

COMPLAINT

20

believes, and thereupon alleges, that the SWPPP prepared for the Facility does not comply with the requirements of Section X(H) of the General Permit. The SWPPP also fails to identify and implement advanced BMPs that are not being implemented at the Facility because they do not reflect best industry practice considering BAT/BCT. According to information available to CCAEJ, the Facility's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.

66.     CCAEJ alleges that during the 2019-2020 reporting year, the Facility entered Level 1 status for N+N and Defendant failed to complete a Level 1 ERA Evaluation by October 1, 2020, and to submit a Level 1 ERA Report by January 1, 2021.

67.     CCAEJ alleges that Peggs' Level 2 ERA Technical Report, submitted to the State Board on December 26, 2018, fails to provide any information evidencing an Industrial Activity BMPs Demonstration.

68.     Information available to CCAEJ indicates that as a result of the above practices, storm water containing excessive pollutants is being discharged from the Facility during rain events into channels that discharge to the Riverside County's municipal storm sewer system, which discharges into the San Sevaine Channel, which flows into Reach 3 of the Santa Ana River.

69.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit.

COMPLAINT

21

70.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water. Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

## VI. <u>CLAIMS FOR RELIEF</u>

<u>FIRST CAUSE OF ACTION</u>
**Failure to Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

71.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

72.     Effluent Limitation V(A) of the General Permit as well as the General Permit's SWPPP requirements require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. Defendant has failed to implement BAT and BCT at the Facility for its discharges of pH, zinc, N+N, iron, aluminum, and other potentially un-monitored pollutants in violation of Effluent Limitation V(A) of the General Permit.

73.     Each day since August 7, 2016, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

74.     Defendant has been in violation of the BAT/BCT requirements every day

COMPLAINT

22

since August 7, 2016.  Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

## SECOND CAUSE OF ACTION
### Discharges of Contaminated Storm Water
### in Violation of Permit Conditions and the Act
### (Violations of 33 U.S.C. §§ 1311, 1342)

75.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

76.    Discharge Prohibition III(C) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation VI(B) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

77.    Plaintiff is informed and believes, and thereupon alleges, that since at least October 18, 2016, Defendant has been discharging polluted storm water from the Facility in excess of applicable water quality standards for pH and zinc in violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

78.    During every rain event, storm water flows freely over exposed materials,

COMPLAINT
23

waste products, and other accumulated pollutants at the Facility, becoming contaminated with pH-altering substances, zinc, and other potentially un-monitored pollutants at levels above applicable water quality standards.  The storm water from the Facility flows untreated into the Riverside County's municipal storm sewer system, which discharges into the San Sevaine Channel, which flows into Reach 3 of the Santa Ana River.

79.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

80.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit. Every day since at least October 18, 2016, that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

## THIRD CAUSE OF ACTION
### Failure to Certify and Submit Complete Annual Reports
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

81.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

COMPLAINT

24

82.     Defendant has failed to comply with the General Permit's requirement to include explanations for any non-compliance of requirements within the reporting year.

83.      Each day since July 15, 2020, that the Facility operates without submitting a complete Annual Report is a violation of Section XVI(B)(3) of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

84.     Defendant has been in violation of the General Permit's Annual Report requirements every day since July 15, 2020.  Defendant continues to be in violation of the Annual Report requirements each day that it fails to prepare and submit Annual Reports for the 2019-2020 and 2020-2021 reporting years.

### FOURTH CAUSE OF ACTION
**Failure to Prepare, Implement, Review, and Update
an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

85.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

86.     The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

87.     Defendant has failed to develop and implement an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement adequate SWPPP for the Facility, is evidenced by, *inter alia*, Defendant's failure to justify each minimum and advanced BMP not being implemented.

COMPLAINT

88.     Defendant has failed to update the SWPPP for the Facility in response to the analytical results of the Facility's storm water monitoring.

89.     Each day since August 7, 2016, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility, respectively, is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

90.     Defendant has been in violation of the Permit's SWPPP requirements every day since August 7, 2016.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

**FIFTH CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring Implementation Plan**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

91.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

92.     The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

93.     Defendant has failed to develop and implement an adequate MIP for the Facility.

94.     Defendant's ongoing failure to develop and implement an adequate MIP

COMPLAINT

26

program is evidenced by, *inter alia*, its failure to collect and analyze storm water samples from all qualifying storm events.

95.    Each day since at least August 7, 2016, that Defendant has failed to develop and implement an adequate MIP for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

## SIXTH CAUSE OF ACTION
### Failure to Comply with
### Requirement for Exceedance Response Actions
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

96.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

97.    Defendant has failed to submit a Level 1 ERA Report for N+N for the 2019-2020 reporting year that complies with Section XII(C) of the General Permit.

98.    Defendant has failed to submit a Level 2 ERA Technical Report that includes an Industrial Activity BMPs Demonstration that complies with Section XII(D)(2)(a) of the General Permit.

99.    Each day since at least December 26, 2018, that Defendant has failed to prepare and submit an adequate ERA Reports for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  This is an ongoing and continuous violation of the Act.

COMPLAINT

27

## VII.  <u>RELIEF REQUESTED</u>

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.  Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the General Permit;

c.  Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

d.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards.

f.  Order Defendant to comply with the Permit's MIP requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

g.  Order Defendant to prepare a SWPPP for the Facility consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

h.  Order Defendant to submit complete and accurate Annual Reports that reflect the changes to the Facility's SWPPP;

COMPLAINT

28

i.   Order Defendant to prepare adequate ERA reports;

j.   Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

k.   Order Defendant to pay civil penalties of up to $56,460 per violation pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

l.   Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

m. Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

n.  Award any such other and further relief as this Court may deem appropriate.

Dated: October 6, 2021          Respectfully submitted,


By:     __/s/ Douglas J. Chermak_____
        Douglas J. Chermak
        LOZEAU DRURY LLP
        Attorneys for Center for Community Action
        and Environmental Justice

COMPLAINT

29